## COMMODITY CREDIT CORPORATION v. STANLEY W. FERGUSON, Inc.

No. 4207.

Circuit Court of Appeals, First Circuit.
May 20, 1947.

Hubert H. Margolies, Atty., Dept. of Justice, of Washington, D. C. (John F. Sonnett, Asst. Atty. Gen., J. Francis Hayden and Joseph C. Duggan, Sp. Assts. to Atty. Gen., James A. Doyle, Associate Sol., Litigation, Dept. of Agriculture, of Washington, D. C., and Edmund J. Brandon, U. S. Atty., of Boston, Mass., of counsel), for appellant.

Maurice Epstein, of Boston, Mass. (Benjamin E. Gordon, of Boston, Mass., of counsel), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment for the plaintiff in an action brought to recover $5,735.60, that being the amount of a premium paid for war risk insurance on 1000 bags of coffee imported by the plaintiff in 1942 under the defendant's coffee program.

The plaintiff is a Massachusetts corporation which for several years has been engaged in the business of importing foodstuffs, principally tea and coffee. The defendant is a Delaware corporation, all of the stock in which is owned by the United States. It functions solely as a corporate agency and instrumentality of the War Food Administration, an agency of the United States. Federal jurisdiction on the ground of diversity of citizenship and amount in controversy is obvious and undisputed.

This litigation has its roots in the coffee shortage which developed in this country during the late war. By mid 1942 that shortage had become acute because of lack of available shipping and because ocean freights and the cost of war risk insurance had increased to such an extent that importers were unable to import coffee and sell it within OPA ceiling prices without incurring a loss. To remedy this situation the United States Government during the summer of 1942 initiated a coffee program which culminated late in the summer in contracts known as Special Coffee Agreements between the defendant as an agency of the Government and domestic coffee importers. Under these agreements the defendant, as the sole authorized importer, purchased coffee in foreign countries belonging to domestic importers, brought it to the United States, and then, if it arrived safely, sold it back to the importer from whom it had been purchased at the price paid for it plus some of the costs of carriage but not the cost of war risk insurance. Thus, in effect, the importer had his coffee transported from abroad to the United States largely at the risk [1] and partly at the cost of the defendant.

The events giving rise to this litigation occurred in large part while this program was in the process of evolution. They were stipulated and those considered material follow in chronological order.

On September 1, 1937, the plaintiff took out a floating policy of marine insurance, (No. 85,394) in the form ordinarily used by coffee importers, in the Agricultural Insurance Company of Watertown, N.Y., insuring whom it may concern against loss or damage to coffee shipped to it. This policy provided that the assured was under a duty to report all shipments coming within its coverage, but it also provided that regardless of such a report the risk on any such shipment attached when it left the seller's warehouse. On October 26, 1938, the plaintiff took out a war risk policy (No. 85,394 W. R.) in the same company, also in the form ordinarily used in its business, and also insuring whom it may concern, covering the same shipments insured against marine risks by policy No. 85,394. However, this war risk insurance did not attach to any shipment "prior to being on board an overseas Vessel." The war risk policy provided that reports of shipments made under the marine risk policy "shall be deemed to

---

[1] The defendant assumed war risks only, not ordinary marine risks.

be reports" under it also, and that it could be cancelled by either party on forty-eight hours' notice to the other "but such cancellation shall not affect any shipment which has been loaded on the overseas Vessel prior to the effective date of such notice."

Then on December 8, 1941, the plaintiff entered into a contract with Messrs. Sampaio Bueno & Cia, Ltda., of Santos, Brazil, for the purchase of 6000 bags of Santos coffee, the war risk insurance premium on 1000 bags of which is here in controversy. On June 23, 1942, the above seller's agent in New York wrote the plaintiff that advice had been received by cable from the seller that "they have shipped, or intend shipping" the 1000 bags of coffee here involved "per Steamer 'Reinholt' " and requesting payment of the freight thereon. Two days later, no doubt in consequence of its receipt of this letter, the plaintiff notified its insurance broker of this shipment, as its insurance policy required, and on June 30, in conformity with prior practice, it sent its check for the freight to the seller's agent in New York for delivery to the agents for the "Reinholt." It appears that the normal, but not invariable, practice in the business is that shipment does not take place until freight has been paid to the steamship company or its agents.

During the period in which these events transpired, in fact since June 9, 1942, the plaintiff "heard some talk in the trade" to the effect that there was to be a government program of some sort to encourage the importation of coffee, and during this period it understood that one of the principal purposes of such a program would be to meet the problem of increased cost of war risk insurance and freight. But it does not appear that it knew specifically how this problem was to be met, until July 10, when it received (1) a telegram from the War Production Board granting its prior application for authority to import coffee under its contract of December 8, 1941, which contained the statement "We are also authorized by Commodity Credit Corporation to advise you that on condition of assignment [2] of such contract to the Commodity Credit Corporation you should not take out war risk insurance since on such assignment war risks will be assumed by the Commodity Credit Corporation all other customary insurance should be taken by you," and (2) a copy of a press release of the Board of Economic Warfare containing substantially the same information.

On the same day that the plaintiff received the information contained in this telegram and press release it wrote its insurance broker to cancel both its marine and its war risk insurance on the 1000 bags of coffee on the "Reinholt" "as we have authorization to make shipment from the Commodity Credit Corporation and notice the boat has not sailed." For some unexplained reason, although both the plaintiff and its broker were in business in Boston, this letter was not stamped by the broker as received until July 18, and on July 20 the broker replied:

"As we have confirmed to you over the telephone, war risk insurance once it has attached is noncancellable and the only way that war risk which has been bound can be cancelled is when the shipment is not made.

"Under these circumstances, we regret very much that we cannot effect cancellation as requested."

In fact the coffee was loaded on the "Reinholt" on July 21 and the ship sailed a few days later, although the plaintiff, and presumably also its insurer and Commodity Credit Corporation as well, due to the secrecy then surrounding the sailing dates of ocean going ships, was not aware of these facts at the time. The coffee arrived in Boston in good condition in August, and on September 9, the plaintiff paid the war risk insurance premium upon it which is the subject matter of this action.

The plaintiff's claim to be reimbursed in the amount of this premium is predicated upon the provisions of the Special Coffee

---

[2] By early July it presumably knew from a Board of Economic Warfare press release of July 1, although we cannot be sure, that there was certain to be some sort of government coffee program and that the program probably would take the form of sales of coffee to Commodity Credit Corporation abroad and repurchases from Commodity Credit Corporation upon its safe arrival in the United States.

Agreement entered into between the parties which by its terms became effective on September 11, 1942, two days after the premium in controversy was paid. According to this contract it was agreed that Commodity should buy all the plaintiff's coffee in foreign countries which it had acquired under purchase contracts made prior to July 2, 1942, but which had not on that date been loaded on board an ocean vessel destined to a point within the continental United States, and that the plaintiff should buy that coffee back again from Commodity upon its arrival in good condition in the United States. Under it Commodity assumed the risk of war loss, but agreed in the following language to reimburse the plaintiff for premiums paid on war risk insurance which it had " procured " prior to the issuance of directions by Commodity not to do so:

"II (A) The Dealer agrees to procure marine insurance on all coffee sold to Commodity hereunder under a form of policy approved by Commodity with loss payable clause in favor of Commodity and the Dealer as their interests may appear, but the Dealer shall not procure war risk insurance except as Commodity directs the Dealer to obtain war risk insurance.

"II (B) All war risk insurance on any coffee sold to Commodity hereunder which was procured by the Dealer prior to the issuance of directions by Commodity in accordance with paragraph II (A) shall be assigned by the Dealer to Commodity and copies of the policies shall be forwarded to Commodity. Commodity shall reimburse the dealer for any premiums actually paid by the Dealer upon such insurance."

The defendant rests all of its arguments on the proposition that it gave the plaintiff timely directions by the telegram and press release of July 10 not to insure its coffee against war risks, and that the plaintiff acting on these directions attempted to cancel, and indeed actually did cancel, its war risk insurance since it gave its insurer notice of cancellation more than 48 hours before the coffee was in fact loaded on board the "Reinholt." From this it argues, broadly speaking, that the plaintiff instead of paying the premium for war risk insurance ought to have resisted any attempt by the insurer to collect it, which it says the

plaintiff could have done successfully. Hence, it argues that the plaintiff's payment of that premium was needless and voluntary, in fact that it amounted to a breach of a duty owed to the defendant, and in consequence the plaintiff cannot recover. The plaintiff on the other hand takes the position that it "procured" war risk insurance on its coffee before the defendant gave any directions not to do so, and that when it learned of the defendant's intention to assume the risk of war loss it attempted to cancel its war risk insurance but did not succeed and could not have succeeded because wartime censorship made it impossible to establish the date upon which its coffee was actually loaded until long after that event occurred. Therefore it says that when it first received the defendant's directions it did all that in reason it could have been expected to do to comply, but that through no fault of its own its exertions were fruitless and the coffee was in fact insured against war risks for the defendant's protection during the voyage. Therefore it contends that it is entitled to be reimbursed by the defendant under the provisions of paragraph II (B) of their agreement. Furthermore, of course, it argues in support of the district court's view (65 Fed.Supp. 261) that the contract of September 1942, being a complete and unambiguous embodiment of the agreement reached by the parties, cannot under the parol evidence rule be altered or modified by their preliminary negotiations, press releases and the like, and that whatever else the phrase "was procured" may mean in the contract as an isolated entity, it and the promise therein "certainly include an obligation on defendant's part to pay such war risk insurance premiums attributable to the coffee purchased as had been contracted for, earned *and* paid prior to the giving of the promise on September 11, 1942."

It seems to us that the district court was correct in its view that looking only at the contract itself the plaintiff is entitled to be reimbursed for the war risk insurance premium here involved. Certainly Commodity could not issue directions to a dealer with respect to taking out war risk insurance "in accordance with paragraph I

(A)" of the contract prior to the time that contract became effective, that is, prior to September 11, 1942, and prior to that date the plaintiff had certainly procured war risk insurance on its coffee. As the district court pointed out, by that date the war risk insurance had not only been contracted for, but it had also been earned and paid for. Thus it had been "procured" under any possible definition of that word and hence the premium for it is a reimbursable item under paragraph II (B).

Nor do we think a different result is indicated if the parol evidence rule is ignored and the informal directions given by Commodity to the plaintiff during the summer of 1942 are considered a part of the written contract which became effective in September of that year. If the plaintiff did not contract for war risk insurance when it took out its floating policy on October 26, 1938, it certainly contracted for such insurance on June 25, 1942, when, as its policy required, it gave its insurer notice of the impending shipment of the 1000 bags of coffee. And by that time it had not been given directions not to insure against war risks. Then on July 10 when it received such directions, even though we regard directions not to insure against war risks as directions to cancel insurance of that nature already contracted for, the plaintiff did all that it could to comply by writing its insurer to cancel. This the insurer refused to do on the ground that the coffee had already been loaded and the risk had therefore attached. But there was an unexplained lapse of eight days between the date of the plaintiff's letter and the date its insurer stamped that letter as received, with the result that the plaintiff did not know that its letter of cancellation had been ineffective until July 20 when in fact it was too late to cancel, since the coffee was actually loaded within 48 hours. Therefore on July 20 it was not only justified in acquiescing in its insurer's refusal to cancel but it was impossible for it to do anything else. Indeed on account of the wartime secrecy surrounding ship movements the plaintiff could not even be sure that its policy was cancellable as early as July 10. Since on that date effective cancellation was impracticable, if not, so far as the plaintiff could know, also impossible, we think under any reasonable definition of the word it had "procured" war risk insurance on its shipment on the "Reinholt" by the time it first received even informal directions not to take out such insurance, with the result that it is entitled to be reimbursed for the premium paid for that insurance under the terms of the Special Coffee Agreement.

The judgment of the District Court is affirmed.