## SEABROOK FARMS CO. v. COMMODITY CREDIT CORP.

### No. 10957.

United States Court of Appeals
Third Circuit.

Argued June 5, 1953.

Decided July 20, 1953.

Neil Brooks, Washington, D. C. (John E. Donahue, Regional Atty., Philadelphia, Pa., Donald A. Campbell, Allan C. Ferguson, Attys., U. S. Dept. of Agriculture, Washington, D. C., on the brief), for appellant.

James F. Masterson, Philadelphia, Pa. (Samuel P. Orlando, Camden, N. J., G. Fred DiBona, Philadelphia, Pa., Douglas V. Aitken, Bridgeton, N. J., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This is an action by the plaintiff to recover against the Commodity Credit Corporation (C.C.C.) on a contract made by that body with the plaintiff, a processor and packer of frozen foods.[1] Plaintiff won in the court below and C.C.C. appeals. There are three questions involved.

Before taking up the questions, however, there is one small point which should be mentioned and dismissed. The appellant, doubtless to create an atmosphere unfavorable to the appellee, continually argued this case as if the plaintiff were seeking to get something for nothing from the taxpayers through this government corporation. We think this suggestion is completely inaccurate. The purpose to be served by these contracts was the promotion of production of vegetables. The processor agreed to pay a stipulated price to growers and in turn, of course, had to sell to consumers at the price set by the OPA. What C.C.C. promised to the processor was to reimburse him for the extra payment he had already made to the grower. The bonuses involved went to the grower, not the processor. Since this contract involved payments to the grower out of the taxpayers' money through the medium of the processor, so far as the processor is concerned it is to be regarded as any other commercial transaction and in no sense a bonus.

The first question involved in this case is whether Seabrook has qualified under a provision of the contract as to time. To comply with the contract, the processor must have made what were called "eligible sales." An "eligible sale" is "any absolute sale by Freezer during the periods February 2, 1946, through June 30, 1946, * * of a designated frozen food at a fixed price, accompanied by * * * transfer of title * * *" The quoted provision is taken from the contract of the parties. All we have to decide is whether there was an absolute sale by the freezer during the period ending June 30, 1946. To this question the seller answers a resounding yes and C.C.C. an equally resounding no.

This is what happened. The seller processed peas and sent them to a public warehouse, the property of a corporation wholly owned by the seller and adjacent to its premises. The peas were sent to this warehouse prior to June 30, 1946. But they were not shipped from the warehouse to the buyers until after July 1, 1946. The question which we must answer here is whether the district court was right in finding there was an absolute sale with passage of title prior to July 1, 1946.

In a sale of goods title usually passes when the parties intend it so to do. Various rules, found in the Uniform Sales Act, are useful in evidencing the intention that title passes to the buyer or is retained by the seller upon the happening of certain events.[2] Between the buyers of the peas and Seabrook there was a provision

---

1. The contract was made by the Commodity Credit Corporation with Deerfield Packing Corporation, predecessor of Seabrook. Seabrook has succeeded to all the rights and liabilities of Deerfield under the contract.

2. Since one of the parties to the contract is an agency of the United States government, the contract is to be governed by federal law. Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S. Ct. 573, 87 L.Ed. 838. In dealing with the property questions involved, however, as whether the transactions were eligible sales under the contract, we look to the law of the state where the transactions occurred. Here that state is New Jersey, which has adopted the rules of the Uniform Sales Act regarding passage of title. N.J.Stat.Ann. tit. 46, § 30–25, which provides in part:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer: * * *

"Rule 4. (1) Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be expressed or implied, and may be given either before or after the appropriation is made.

"(2) Where, in pursuance of a contract to sell, the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or

in their contracts that "title to the goods * * * shall pass to the buyer immediately upon delivery to the initial carrier at the point of origin, and the issuance by the initial carrier of a shipping receipt or Bill of Lading therefor * * *" C.C.C. makes much ado of this provision; in fact, it is the heaviest gun in its battery. It argues the case as though the provision for title to pass upon delivery to the initial carrier means that title was to pass only upon such delivery. The provision just quoted is a common form of "boiler plate" found in sales contracts and in this particular instance was part of a rather considerable amount of fine print contained upon the order form which buyers of frozen peas used in ordering goods from Seabrook.

There is one other circumstance, too, that argues for the non-passage of title upon delivery to this warehouse. The goods were to be repacked upon customers' demand later. Usually the fact that a seller is to do something further with the goods indicates that title has not yet been passed.[3] But the fact is without significance here because it appears that there was a shortage of containers that season, and sufficient containers for customers' use were not available at the time the peas were ready to be put in frozen storage.

On the order form used by the buyers of the peas there was a printed provision marked "F. O. B.", another printed provision "Ship Via", and another "Ship—When?" Following the "Ship—When" inquiry is the buyer's direction "as advised",
and this likewise applies to the "Ship Via" space. Following "F. O. B." in typewritten letters appears "Cumberland Warehouse, Bridgeton, New Jersey." Seabrook seizes upon this latter phrase to clinch its position with the point that where typewritten and printed provisions are in conflict the typewritten part prevails.[4] The question, however, is not quite so easy as this. As Professor Williston points out, some confusion has arisen through the use of the term "F. O. B." in situations for which it was not devised. It originally had to do with carriage by sea, and "free on board" a given ship is a pretty clear indication of what the parties meant. When applied to railroad transportation it loses some of its clarity, as Williston points out.[5] But neither lawyers nor courts can confine business people to the use of terms in a channeled orthodox sense, and so we must apply the use of "F. O. B." in this instance as best we can.

We have no doubt that what the buyer meant to direct in this case was the delivery of these peas to this warehouse which, though owned by the seller, was the property of a separate corporation. We have no doubt that the parties intended this delivery to be the transfer of title by the seller to the buyer of the peas. To support the conclusion, we do not have to depend upon the term "F. O. B. Cumberland Warehouse" alone. The testimony shows that this merchandise was stored in the warehouse in bins for the individual purchasers. In other words purchaser A's peas were put in a different bin from those of pur-

not) for the purpose of transmission to or holding for the buyer, he is presumed to have unconditionally appropriated the goods to the contract, except in the cases provided for in the next rule and in section 46:30–26 of this title. This presumption is applicable, although by the terms of the contract the buyer is to pay the price before receiving delivery of the goods, and the goods are marked with the words "collect on delivery", or their equivalents.

"Rule 5. If a contract to sell requires the seller to deliver the goods to the buyer, or at a particular place or to pay the freight or cost of transportation to the buyer, or to a particular place,
the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

3. "Rule 2. Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done." N.J.Stat.Ann. tit. 46, § 30–25. Unascertained or future goods must also be put into a "deliverable state" before title passes. See Rule 4 (1).

4. Restatement, Contracts, § 236(e).

5. See 2 Williston, Sales, §§ 280–280b (Rev. Ed.)

chaser B. Purchaser A and all the rest of the purchasers began to pay storage and other charges beginning July 1st. The warehouse issued either negotiable or non-negotiable receipts at the buyer's request. It certainly would be extraordinary if a warehouseman issued a negotiable warehouse receipt for merchandise to which the person to whose order the receipt was made did not own it. That would be an admirable way for the warehouseman to get into trouble, and the purchaser likewise. The goods were paid for a few days after delivery to the warehouse and were shipped out at the buyer's direction to whatever persons the buyer resold the merchandise. The warehouse records listed ownership of the peas in the name of the individual purchaser.

The conclusion of the trial judge that "title to the frozen peas passed to the various vendees upon delivery thereof to the Cumberland Warehouse to the accounts of the vendees" was correct.

██ The second question involved has to do with another requirement in the definition of "eligible sales" as set out in the contract between the C.C.C. and the processor. The contract provides " 'eligible sale' shall not include a transfer of title, to a designated frozen food, by a Freezer to any person or firm controlled by or affiliated with such Freezer by stock ownership, agreement, or otherwise * * *" Some of the sales made by the processor were to a firm called Gorsen & McCormick Frozen Foods Co., Inc. This was a distributing firm. C.C.C. says that it was controlled by or affiliated with Seabrook in such a way that the sales to it were not, under the terms of the contract, "eligible sales." The trial judge ruled against C.C.C. on this point. We agree with him.

The findings of fact made by the trial court are not disputed by C.C.C. This sales organization owned no shares in Seabrook or its predecessor; likewise the packing corporation owned no shares in Gorsen & McCormick Frozen Foods Co., Inc. Two sales executives of the processor were directors of the distributing corporation. It was two sales executives of the processor who induced Gorsen & McCormick, there-tofore operating as a partnership, to incorporate and become distributors for the processor under a "brand" name. It is true that at the organization meeting of this distributing corporation the two sales executives of the packing corporation "represented two-thirds of the shareholders and incorporators present." But the district court goes on specifically to find "this representation was a straw representation and they did not actually own the stock represented by their certificates."

In other words we have here a processing corporation which for its own purposes desires to have a local distributor incorporated and take over the sales problem involved in building up a clientele for a brand-named line of frozen vegetables. The fact that the processing corporation was the instigator and promoter of the distributor does not make it affiliated with or controlled by the processor. It will be noted that there is no common stock ownership. It is a matter of common knowledge that manufacturing corporations frequently make the moves to get distributing outlets in various places. This is an instance of such practice. The fact that the processor wanted an outlet for brand-named goods and got these people to provide it does not make sales to the distributing corporation ineligible sales under the contract. The district court was right.

Our third question here is the matter of interest. The district court allowed interest at six per cent from January 1, 1947. Of this allowance C.C.C. complains. It does not say outright that it does not have to pay interest for default on its contract. Whether it does have to pay interest was considered and answered in the affirmative by Judge Wyzanski in Stanley W. Ferguson, Inc., v. Commodity Credit Corp., D.C.Mass.1946, 65 F.Supp. 261, affirmed 1 Cir., 161 F.2d 540, without discussion of the interest point. Judge Wyzanski pointed out in the opinion cited that the question of interest is one of contract law, and since the contract was made with an agency of the United States it is governed by rules promulgated by United States statutes, or, in their absence, by judges of the United States courts. He

said further that since the contract in question in his case was made in the District of Columbia, the rate of interest would be the one there prevailing, six per cent.

In this case C.C.C. argues that it necessarily took some time for an audit to be made to determine what, if anything, the plaintiff had coming. It also charges that the plaintiff failed to produce documents relevant to that examination, and that through the plaintiff's own nonaction in this respect the final settlement of the issue between the parties as to amounts due was long delayed.

Before we can decide whether the plaintiff is entitled to all or any part of the interest it claims we shall have to have some more findings of fact from the trial court. We have read some of the testimony, and the witnesses, to understate the matter, do not all talk to the same effect. The resolving of conflicts in testimony is, of course, a trial court function and not ours.

We shall, therefore, affirm the conclusions of the district court on the first two points involved. We shall vacate the judgment and return the case to the district court for findings of fact with regard to the plaintiff's claim for interest.

The judgment of the district court will be vacated and the case remanded to that court for further proceedings in accordance with this opinion.