**H. J. HEINZ COMPANY, Plaintiff,**

v.

**Stanley GRANGER, Collector of Internal Revenue, Defendant.**

**H. J. HEINZ COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 10358, 11557.**

United States District Court
W. D. Pennsylvania.

Nov. 20, 1956.

Percy W. Phillips, Ivins, Phillips & Barker, Washington, D. C., Thomas J. McManus, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

D. Malcolm Anderson, Jr., U. S. Atty. Pittsburgh, Pa., for defendant.

JOHN L. MILLER, District Judge.

These are suits to recover alleged overpayments of excess profits taxes, declared value excess profits taxes, and income taxes for the taxpayer's fiscal years 1945 and 1946. The cases were tried together before the court without a jury and involve the single question whether subsidies based upon certain sales paid to the taxpayer pursuant to contracts negotiated between it and Commodity Credit Corporation were properly accrued in the fiscal years in which the sales were made, or, as contended by the taxpayer, when the respective claims for subsidy payments were audited and approved by Commodity Credit Corporation.

### Findings of Fact

1. The facts stipulated, so far as pertinent, are found and are incorporated herein.

2. Plaintiff is, and during the years involved was, engaged in the purchase and canning of vegetables and vegetable products and in the sale of canned vegetables, soups, and other like products. It maintained various plants in which such vegetables were canned and/or manufactured or blended into other canned products.

3. Prior and subsequent to the periods involved, the plaintiff kept its books and filed its federal tax returns upon the accrual basis of accounting and on the basis of a fiscal year beginning May 1st and ending April 30th.

4. During the years in question, the United States Government operated a program to assure the maximum production of certain canned foods and to make such canned foods available for civilian consumption at prices no higher than prices set by the Office of Price Administration.

5. The plaintiff participated in this program and on or about October 23, 1944, and as of March 1, 1944, entered into an agreement with the Commodity Credit Corporation, referred to herein as Commodity, a corporate agency of the United States of America, which administered the program relating to maximized production of canned foods pursuant to the direction of the Director of Economic Stabilization and Executive Orders 9250, 9301 and 9328 issued by the President of the United States on October 3, 1942, February 11, 1943, and April 8, 1943. A further similar agreement was negotiated between the plaintiff and Commodity on October 23, 1945, as of May 1, 1945.

6. The 1944 agreement related to the plaintiff's 1944 pack and in general provided that the plaintiff in making purchases of designated vegetables would pay the grower the appropriate grower's support price as determined in the grower support price program. Commodity, in turn, agreed to pay the plaintiff subsidies based on the sales of certain specified canned products provided the plaintiff had paid the grower support price applicable at the place of delivery of the vegetables used in making the canned products and met certain conditions including those relating to "eligible sales."

7. In order for a sale to qualify as an eligible sale, it must have been an absolute sale of a designated canned food at a determined price accompanied by transfer of title to the purchaser other than a Government procurement agency; provided however, the product had not been packed, sold or delivered:

a. in violation of any applicable order or regulation of the Office of Price Administration;

b. in violation of any provision of War Food Order 22–6 requiring percentages of the pack at each of the plaintiff's plants to be set aside for purchase by the Government;

c. in violation of War Production Board Orders imposing detailed restrictions on the production and use of tin plate cans.

Moreover, the sale of a product previously sold to and thereafter purchased from a Government procurement agency did not qualify as an eligible sale.

9. The plaintiff's right to receive subsidies was further dependent upon the following conditions:

a. Compliance with Executive Order 9301 establishing a minimum work week of forty-eight hours;

b. Compliance with a contractual provision forbidding discrimination against workers because of race, creed, color or national origin;

c. Compliance with wage, salary and price stabilization orders and regulations;

d. Obtaining and retention of certifications by State Agricultural Conservation Committees of its numerous plants and with respect to foods to be processed at such plants.

10. Payment of subsidies based on eligible sales was to be made by Commodity after receipt of an application, subject to the terms and conditions of the agreement and on the basis of a preliminary audit of the application, with reductions for the amount of offset attributable to open market purchases as calculated in accordance with the agreement.

11. Applications were to be submitted at specified times with respect to eligible sales and on a designated form calling for data necessary to support a mathematical computation of an award. An official of the plaintiff was required to certify that the information contained in the application was correct.

12. With respect to each application, the plaintiff was required to furnish such supporting evidence, documents, information and proofs as Commodity might require. Both agreements contained provisions like the following:

"Commodity shall have the right to reject, in whole or in part, any application for payment hereunder in the event such application for payment or the transactions included therein are not in accordance with this agreement. The

rejection, as aforesaid, by Commodity of an application for payment shall not preclude the subsequent filing by Canner, within the time limits specified herein, of a new application for payment with respect to the transactions involved in such rejected application or rejected portion thereof together with evidence of Canner's alleged compliance with this agreement; and, if such evidence is satisfactory to Commodity, such application shall be accepted by Commodity."

13. The 1944 agreement was amended from time to time to include additional vegetables and products and extending the period in which qualifying sales could be made and applications submitted.

14. The designated application form included a provision requiring the plaintiff to supply a certified list of invoice numbers or a copy of invoices pertaining to claimed eligible sales and a designation of the plant at which the product sold was manufactured. Because of the plaintiff's manner of conducting its business, these requirements proved burdensome and impractical and at plaintiff's request were waived by Commodity. A simplified procedure was adopted in which sales were attributed to plants of the plaintiff having the lowest applicable subsidy rates. No other waivers of conditions of the contract were made.

15. Commodity had the right, in its absolute discretion and on such terms as it might determine, to waive performance of any acts required to be done by the plaintiff under the agreement and reserved authority to amplify or clarify any provision of the contract without changing its substance as well as the right to alter specified procedures.

16. The plaintiff operated twelve factories and seventy distributing warehouses located in various states, employing 5,000 to 15,000 persons during the periods involved, the largest employment being during the canning season in the fall of the year. A number of products were manufactured in each of its plants.

17. During the periods involved, the plaintiff experienced difficulties in complying with the conditions, Governmental orders and regulations to which both the 1944 agreement and the 1945 agreement later negotiated were subject. In spite of diligent efforts of the plaintiff's agents, violations could readily have occurred.

18. Applications for payment based on eligible sales were filed from time to time and in a few instances approval was held up because of discrepancies in figures or the absence of data relating to inventories and purchases from other canners.

19. In passing upon applications, apart from establishing that the plaintiff's certifications were in order and that the plaintiff had paid the appropriate grower support price, Commodity made no independent inquiry to determine whether the plaintiff had in fact fully complied with the conditions of the agreement. With respect to the plaintiff, its usual practice was to accept the certification endorsed upon the application for payment as satisfactory evidence of plaintiff's compliance with applicable O.P.A. regulations, the governmental set-aside order, the tin conservation order, the minimum work week order, the employment practices clause of the contract and such other regulations applicable to the contract.

20. In the event Commodity received information from another agency that a canner was in violation of a provision or condition of the agreement, its practice was to withhold subsidy payments, at least in sufficient amount to cover the alleged violation. In connection with reports of violations of O.P.A. regulations, a letter was sent out demanding information pertaining thereto and stating that no subsidy payments would be made by Commodity until the requested information was received and a complete investigation of the alleged violation was made.

21. Although no difficulties arose with plaintiff concerning the proper amounts to be set aside from a canner's pack under War Food Order 22–6, claims of other canners were sometimes held up

because of disputes with Commodity as to amounts of product available for civilian purchase or failures by the canner to set aside the product from a proper plant. A dispute, not resulting in the withholding of subsidy payments, arose between plaintiff and Commodity as to the proper application of the term "designated canned food" to condensed tomato soup made from tomato puree. Commodity on the basis of "legal and administrative interpretations" of the contract determined that subsidies were payable on the soup rather than on such puree.

22. On October 23, 1945, and as of May 1, 1945, taxpayer entered into an agreement with Commodity similar to the 1944 agreement but covering the 1945 pack. The 1945 agreement however did not exclude from the definition of an eligible sale a sale which was made in violation of an order or regulation of the O.P.A. It provided for a reduction in the applicable subsidy rate in the event that eligible sales were made at prices in excess of applicable maximum civilian prices. Amendments and waivers similar to those effected under the 1944 agreement were subsequently negotiated.

23. The taxpayer's right to subsidies was not fixed either as to the liability of Commodity to make payments thereof or as to the amount thereof until audit and approval of the taxpayer's respective applications.

24. On or before April 30, 1945, plaintiff had accrued on its books income in the sum of $481,357.53 representing subsidy payments it claimed were due for sales made during its 1945 fiscal year. Claims for this amount were filed during April and May of 1945 and in September, 1945, were approved by Commodity and paid to the extent of $477,875.83. The difference of $3,481.70 between the amount claimed and the amount approved was due in part to mechanical errors and in part to Commodity's determination that the plaintiff had not attributed sales to the plant having the lowest applicable subsidy rate.

25. On or about July 15, 1945, taxpayer filed a timely income and declared value excess profits tax return and an excess profits tax return for its fiscal year 1945. In computing the net income shown upon its 1945 returns taxpayer included in gross income the sum of $481,357.53 which it had accrued on its books on account of 1945 sales.

26. During the period June through December, 1945, taxpayer filed claims under the 1944 pack agreement for sales made during part of its fiscal year 1946, namely, the period May through November, 1945, in the sum of $125,723.23. During the period September, 1945, through March, 1946, these claims were approved and paid in the total sum of $120,913.39. The difference of $4,812.82 between the amount claimed and the amount approved was due in part to mechanical errors and in part to Commodity's determination that the plaintiff had not attributed sales to the plant having the lowest applicable subsidy rate.

27. During the period October, 1945, through May, 1946, taxpayer filed claims under the 1945 pack agreement for sales made during its fiscal year 1946 in the sum of $698,881.63. These claims were approved and paid in full, after the close of the taxpayer's 1946 fiscal year.

28. Prior to or as of April 30, 1946, taxpayer accrued on its books as income the sum of $816,313.32 representing subsidy payments which it had determined were due it from Commodity for sales made during the fiscal year 1946 under both the 1944 and 1945 pack agreements as reduced by the sum of disallowed portions of claims for sales during fiscal years 1945 and 1946 which had been acted upon and paid by Commodity prior to April 30, 1946. On or about July 15, 1946, taxpayer filed a timely income tax return and excess profits tax return for its fiscal year 1946. Upon those returns taxpayer did not report the sum of $816,313.32 which it had accrued as income on its books. It reported the sum of $598,789.22 being actual receipts during fiscal year 1946 of subsidy payments for sales made during both the fiscal

year 1945 and the fiscal year 1946, including the sum of $477,875.83 mentioned in Finding No. 24.

29. Following examination of the returns for the fiscal year 1946, the sum of $217,524.10 was added to taxpayer's income for that year. Such sum was the difference between $816,313.32, the amount accrued on taxpayer's books for that fiscal year, and the amount reported. As a result of this and other adjustments, the Commissioner of Internal Revenue assessed deficiencies in income and excess profits taxes, which deficiencies were paid.

30. On December 30, 1949, taxpayer filed timely claims for refund for the fiscal year 1945, claiming refund of $395,-907.61 paid as excess profits taxes and $10,797.48 paid as declared value excess profits taxes on the ground that it had erroneously included the sum of $481,-357.53 in its gross income since that amount representing claimed subsidies was not received in that year and therefore did not constitute a proper item to be accrued as income in that year.

31. On March 5, 1951, taxpayer filed a timely claim for refund for the fiscal year 1946, claiming refund of $149,460.-37 paid as income and excess profits taxes on the ground that only such subsidy payments as were received in that year should be accrued as income in that year. Thereafter plaintiff filed claims for refund of income and excess profits taxes under section 722 (special relief) of the Internal Revenue Code. 26 U.S.C.A. Excess Profits Taxes, § 722. Said claims were allowed in part and adjustments of income and excess profits taxes were made accordingly. One of such adjustments was to increase the income tax for the fiscal year ended April 30, 1946, by $38,314.40. Such increased income tax was thereafter paid on June 2, 1952, by credit thereto of overassessments of other taxes. Claim for refund of the additional assessment of income tax in the sum of $38,314.40 was timely filed on May 6, 1954. After six months had expired without action on such claim, the complaint in No. 11557 was amended to incorporate the claim therein.

32. On July 11, 1951, taxpayer's claims for both fiscal years were denied in full by the Commissioner of Internal Revenue and these actions were timely begun.

### Discussion

 Under the accrual method of accounting for tax purposes, the right to receive rather than actual receipt determines whether an amount should be included in gross income. Spring City Foundry Co. v. Commissioner, 1934, 292 U.S. 182, 184–185, 54 S.Ct. 644, 78 L.Ed. 1200. Neither party disagrees with that statement or with the rule that an item should not be accrued unless there is a fixed and determined right to receive a reasonably ascertainable amount. Continental Tie & Lumber Co. v. United States, 1932, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111; United States v. Safety Car Heating & Lighting Co., 1936, 297 U.S. 88, 56 S.Ct. 353, 80 L.Ed. 500; United States v. Harmon, 10 Cir., 1953, 205 F.2d 919; C. A. Durr Packing Co., Inc., v. Shaughnessy, D.C.N.D.N.Y.1948, 81 F.Supp. 33, affirmed per curiam, 2 Cir., 1951, 189 F.2d 260, certiorari denied 342 U.S. 850, 72 S.Ct. 78, 96 L.Ed. 641; United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 and Dixie Pine Products Co. v. Commissioner, 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 are frequently cited as authority for the proposition that when all of the events have occurred which fix the amount and the fact of the taxpayer's liability to pay a tax, accrual is proper. And if all that remains to be done is the filing of a claim or the mere computation of the amount due and there is a basis for estimating the amount with reasonable exactitude, accrual is nevertheless required though neither has been done. Continental Tie & Lumber Co. v. United States, supra.

Continental Tie & Lumber Co. v. United States, supra, upon which the Government places principal reliance, involved the Transportation Act of 1920, 49 U.S. C.A. § 77, under which the Government

was liable to railroads for deficiencies sustained due to the operation of the railroads by the United States during World War I. The court there determined that the Act itself gave the taxpayer a definite and fixed right to payment and that all that remained thereafter was an administrative procedure of ascertaining the sum to be paid. Since the taxpayer had in its own records all of the data necessary to ascertain the amount due and was furnished with instructions as to how the amount should be calculated, a reasonable estimate of the sum could have been made in the year that the right to receive became fixed. It was therefore held that the taxpayer was required to accrue in 1920, the year in which the statute was enacted, the amounts which were awarded and paid in 1923. See also Commissioner of Internal Revenue v. Dumari Textile Co., Inc., 2 Cir., 1944, 142 F.2d 897, affirming 47 B.T.A. 639.

In Harrold v. Commissioner, 4 Cir., 1951, 192 F.2d 1002, also cited by the Government, it was held that a strip coal mining operator could properly deduct as an accrued expense the estimated cost of backfilling in later years the areas strip mined during the taxable year. But, in that case, too, the obligation was fixed by a statute which required the operator to backfill and replant the mined areas, although performance of the work could be deferred. Cf. Patsch v. Commissioner, 3 Cir., 1953, 208 F.2d 532. In Dally v. Commissioner, 9 Cir., 1955, 227 F.2d 724, the taxpayer had contracted with a federal agency to manufacture and deliver pre-fabricated housing units under an agreement providing he would be paid 90% of the prices stipulated for units accepted and delivered upon the submission of properly certified invoices or vouchers. Nevertheless, it was held that the taxpayer's right to the payments under the contract matured upon delivery of the articles in 1942, and that the sums paid should be accrued in that year although the required certificate was not filed until 1943. But there, under the principle of Con-

tinental Tie & Lumber Co. v. United States, supra, the " * * * mere mechanical act of making out the necessary voucher did not operate to postpone the accrual of the sum which had been earned." 227 F.2d at page 726.

Having cited these and kindred cases, the Government argues that all of the facts upon which the calculation of the subsidies depended were ascertainable during the fiscal years in which the eligible sales were made and that all that was left was a ministerial calculation by Commodity of the amount due.

On the other hand, the plaintiff cites Lucas v. North Texas Lumber Company, 1930, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668, a case in which a vendor was not permitted to accrue in 1916 the purchase price of land sold pursuant to the exercise of an option by the vendee late in that year. Since it was expressly provided that the price would be paid "as soon as the papers were prepared" and that event did not occur until 1917, the Supreme Court held that no "unconditional liability" for the purchase price arose until then. Conceding that, regardless of the North Texas Lumber Company case, flimsy paper contingencies ought not to be used as a basis for avoiding a tax, this court is satisfied the present facts fall without the orbit of Continental Tie & Lumber Co. v. United States, supra.

The significant fact which arises from the data before the court is that the plaintiff's right to receive any subsidy was governed by contracts which conditioned the right not solely on the mechanical act of submitting an application or on a mere administrative procedure to ascertain sums due. Payment was expressly made "subject to the terms and conditions" applicable to the contracts and it is evident that those terms and conditions included more than the making of eligible sales. Specifically, sections (6) and (7) of the 1944 agreement and sections (7) and (8) of the 1945 agreement, in terms rather too clear to need construction, required the plaintiff to furnish with respect to each applica-

tion such supporting evidence, documents and proofs "as Commodity may require" and provided for rejection, in whole or in part, if any application or underlying transaction was not established by evidence "satisfactory to Commodity" to be in compliance with the agreement.

■ Perhaps courts have sometimes in postponing the accrual of income placed undue emphasis upon contractual provisions. Cf. Craig v. Thompson, 8 Cir., 1949, 177 F.2d 457, where apart from the terms of the contract, absence of current estimates made it impossible to determine the cost of excess work performed until completion of the long term contract. Nevertheless, the principle is clear that where the parties to a contract have really made payment dependent upon the happening of some condition, their agreement should not be disregarded for tax purposes. A convincing example is found in United States v. Harmon, supra, where, under a construction contract, payment of the retained portion of the fixed fee was to await final acceptance of the work and final determination of costs incurred by an audit of the books of the contractor and subcontractors involved. Although it appears that all that remained was the determination of the amount of payment, and to that end, data necessary to a computation was available in the books of the contractors and the method to be used in making the computation must have been known, the majority, relying on Lucas v. North Texas Lumber Co., supra, rather than the Continental case, holds that until the audits had been completed no unconditional liability to make payment arose. See also the concurring opinion of Chief Judge Phillips.

■ While there are apparently no reported cases dealing with the right to accrue subsidies under contracts quite like these, the court is not left to conjecture in determining that the contingencies of those contracts were real from a tax law viewpoint. But, certainly, Cloverleaf Creamery Co., Inc., v. Davis, D.C.N.D.Ala.1951, 97 F.Supp. 121, is not the pertinent analogy. There the taxpayer's right to receive butter subsidies was subject only to his filing certain required reports, refraining from wilful violation of O.P.A. regulations and passing on all subsidy benefits to his suppliers. Unlike the present case, the conditions were narrow and, as the court determined, the facts relating to performance thereof were within the knowledge of the taxpayer in the taxable year. And, the right to receive the subsidies did not depend upon establishing to the satisfaction of the federal agency that all applicable conditions had been met. The plaintiff says, and this court agrees, that the more persuasive comparison of these subsidies is with the conditional payments which producers received under Title III of the Sugar Act of 1937, 50 Stat. 903, 909, presently authorized under the similar Sugar Act of 1948, 7 U.S.C.A. § 1131 et seq. Under those acts, the Secretary of Agriculture was authorized to make payments in the nature of subsidies to producers of sugar from cane and beets harvested in specified periods. Payment was dependent upon the producers meeting certain conditions, for the most part regulated by the Secretary, relating to the employment of child labor, the payment of fair and reasonable wages, the observance of quotas, the purchasing of raw products at indicated prices and the following of various conservation methods. The Secretary's determinations as to facts constituting the basis of payment were made conclusive. Early in the history of the 1937 Act, the Treasury informally ruled that the payments an accrual system taxpayer expected to receive under the statute should not be reported as income until the payments were authorized by the Secretary of Agriculture. I.T. 3187, Cum.Bull. 1938–1, pp. 159–160, cogently stresses that the right of the producer to such payments was contingent upon his meeting the applicable conditions to the satisfaction of the Secretary of Agriculture and until that was done, neither the taxpayer's right to the income nor the Government's liability to

make the payments was fixed. Thus, the ruling states the familiar rule:

"If payment of the income, even though earned, is contingent upon the happening of future events and may never be received, a taxpayer should not be required to pay a tax thereon."

■ Such a ruling is not binding on this court but it is entitled to consideration, particularly when it sets forth a view which has apparently not been departed from, by the department itself over a period of many years. While there are differences between the conditional provisions of the Sugar Act of 1937 and those of the present contract, none can be regarded as essential. In either instance the receipt of subsidies was subject to the making of a factual determination by the party controlling the payment of satisfactory performance of applicable conditions. Little purpose would be served in detailing the problems encountered by the plaintiff in attempting to comply with the numerous governmental orders and regulations to which the contracts were subject. Problems of interpretation, changing regulations, the magnitude of the plaintiff's operation, pressures to maximize production and inexperienced or uninformed employees made violations possible. Moreover, real differences of opinion could arise as to whether or not there had been violations. As the court said in Iglesias Costas v. Secretary of Finance of Puerto Rico, 1 Cir., 1955, 220 F.2d 651, 653, a case dealing with the accrual of Sugar Act subsidies:

"It is perfectly true that at the end of any crop year the producer has either met these conditions precedent or he has not. If he has, and the Secretary so determines as a fact, then he gets his subsidy. At the end of a given sugar growing season, the producer may believe (and in the event it may be established, as in this case, that his belief was correct) that he had com-

plied with all the conditions upon which the right to the subsidy depended. But the confirmation of such belief is dependent upon many complex determinations of fact by the Secretary; and numerous disputes of fact may well arise, and have to be resolved, before the Secretary approves an application for payment. * * *"

In that case, the court affirmed a decision of the Supreme Court of Puerto Rico which had applied to Sugar Act subsidies the rule of accrual stated in I.T. 3187, supra, under the accrual provisions of the revenue laws of Puerto Rico rather than under the similar provisions of the federal code,* involved here.

The analogy to the accrual of Sugar Act subsidies is not rendered invalid because, as it happened in the present case, Commodity generally accepted the certification of a canner's application as satisfactory evidence of compliance with the various terms and conditions of the contracts. Under the agreements, the requisite quantum of proof was left to the discretion of Commodity and the fact that it chose to require little rather than much did not constitute a waiver of any condition or render the plaintiff's claim less contingent until approval by Commodity. In spite of the fact that Commodity itself made no investigations to determine whether a canner was obeying all the applicable orders and regulations, it is established that steps were taken to withhold subsidies, pending an investigation, where information relating to alleged noncompliance was received from other governmental agencies.

The conclusion is reached that the function of Commodity under these contracts was unlike that of the commission in the Continental case where the determination of the amount due was a ministerial act confined to the books and records of the taxpayer and within limits prescribed by the applicable statute. It could not be questioned that Com-

---

* 26 U.S.C.A. §§ 41, 42(a) (I.R.C.1939).

modity had reserved to itself a considerable amount of discretion with respect to the determination of when conditions requisite to the payment of subsidies had been fulfilled.

It is enough to say that the present transactions undoubtedly gave rise to the same possibility of complex or contested issues of fact relating to compliance which led the court in the Costas case to label the determinations of the Secretary under the Sugar Act "quasi-judicial." The nonministerial nature of Commodity's function is more apparent in light of other powers reserved to it in the contracts. Thus, Commodity, in its *absolute discretion* and on such terms as it might determine, could waive any performance required of the plaintiff. It had retained authority to alter procedures set out in the agreements and make interpretations of its terms. Even with the aid of section 1 of the contracts, such terms as "place of delivery," "area," or "eligible sales" admit of no absolute definition, but, nevertheless, an exercise of Commodity's reserved right could result in a canner's receiving no subsidies at all. It should be noted that the proper application of the term "eligible sale" gave rise to litigation involving other canners in at least two instances. Seabrook Farms Co. v. Commodity Credit Corp., 3 Cir., 1953, 206 F.2d 93; Harlingen Canning Co. v. Commodity Credit Corporation, 5 Cir., 1951, 193 F.2d 176.

■■ Two other points of the defendant require mention. The first is that the taxpayer's true income picture would be distorted unless the income and the deductions attributable thereto are reported in the same year. The answer is that the decision in Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725, clearly precludes the Commissioner from allocating income to a taxable year other than a year in which a fixed right to receive a reasonably ascertainable amount existed, regardless of whether a more equitable result would otherwise be achieved. United States v. Olympic Radio & Television, Inc., 1955, 349 U.S. 232, 236, 75 S.Ct. 733, 99 L.Ed. 1024. The second point is that the taxpayer actually did accrue in the years of the sales the amount of the subsidies it later received, with a small margin of error. It is well established that bookkeeping entries do not produce either income or losses for purposes of taxation, although in some circumstances they are of evidential value. Doyle v. Mitchell Brothers Company, 1918, 247 U.S. 179, 38 S. Ct. 467, 62 L.Ed. 1054; Commissioner of Internal Revenue v. Goldberger's Estate, 3 Cir., 1954, 213 F.2d 78; J. E. Mergott Co. v. Commissioner of Internal Revenue, 3 Cir., 1949, 176 F.2d 860; Northwestern States Portland Cement Co. v. Huston, 8 Cir., 1942, 126 F.2d 196. It is conceded that the plaintiff did make a rather accurate forecast of the amounts it would receive, although it may be noted that the difference between the amounts claimed and amounts approved should have as much significance here as similar differences had in United States v. Harmon, supra. Shorn of the latter consideration, the bookkeeping entries *do not* prove that the liability of Commodity to make subsidy payments was fixed since that liability was determined by circumstances not necessarily reflected in the taxpayer's keeping of books.

### Conclusions of Law

1. The court has jurisdiction of the subject matter and of the parties.

2. The subsidy payments received by the plaintiff were accruable in the fiscal years in which the respective applications therefor were audited and approved by the Commodity Credit Corporation.

3. The plaintiff is entitled to judgment in accordance with the foregoing findings of fact and these conclusions of law.

The parties have agreed, in the event of a decision for plaintiff, to stipulate the amount of recovery of tax and interest. Accordingly, entry of orders for final judgments will be deferred pending receipt of the stipulation.