## STANLEY W. FERGUSON, Inc., v. COMMODITY CREDIT CORPORATION.

Civ. A. No. 3330.

District Court, D. Massachusetts.

April 1, 1946.

As Amended April 12, 1946.

262

Benjamin E. Gordon, and Stanley Epstein, both of Boston, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., and Harold G. Jackson and Jackson J. Holtz, Asst. U. S. Attys., all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

Plaintiff, a Massachusetts corporation, brings this action of contract to recover from defendant, a Delaware corporation, $5,735.50 with interest at 6% from May 13, 1943. Plaintiff sues under the express terms of an agreement made in Washington, D. C., September 11, 1942. In that contract defendant agreed (1) to buy from plaintiff certain coffee, including a shipment of 1000 bags now relevant, and (2) to reimburse plaintiff for any premiums actually paid by plaintiff for war risk insurance which "was procured" on that coffee prior to defendant's issuance of directions in accordance with the September 11, 1942 contract. Plaintiff claims that on September 9, 1942 it actually paid an insurance company $5,735.50 for war risk insurance which it had procured on that coffee, that on May 13, 1943 plaintiff made demand upon defendant for that sum and that defendant has never met that demand.

The contract upon which plaintiff sues is a so-called "Special Coffee Agreement." It is upon two governmental forms, 1942 C.C.C. Coffee Form and Form Supplement No. 1. This agreement was proposed in the light of the shortage of coffee which was so noticeable in the early days of American participation in World War II. That shortage was at its worst in 1942. It was caused in part by a lack of available space on commercial ships and in part by an economic pincers which gripped American coffee importers. They had to pay increased costs of carriage, including increased premiums for war risk insurance to cover the new risks of ocean voyages; yet they were precluded by OPA maximum price regulations from charging their American customers increased prices for the coffee.

Various governmental agencies and corporations, including defendant, considered this problem. They shaped plans under which defendant as the sole authorized importer of coffee would buy in foreign countries from American private coffee importers all coffee which those importers thereafter bought abroad as well as all coffee that they had previously bought but which had not been placed on board a vessel prior to July 2, 1942. Defendant would pay for that coffee what the importer had paid plus certain of his costs. It would then assume the risk of war loss during ocean carriage and it would also absorb some of the other costs of carriage. If the coffee landed in the United States in good condition, the private importer would have the right to repurchase the coffee at the price he sold to defendant plus some of defendant's costs of carriage not including, however, the war risk insurance costs absorbed by defendant. Thus, in effect, the importer would have his coffee transported from abroad to the United States largely at the risk and partly at the cost of defendant.

While these plans were under consideration in June and July 1942, news of them was carried in certain trade papers, trade association bulletins and governmental press releases. The news indicated that under the final plan defendant would reimburse the importer for costs of any war risk insurance which had already been procured but defendant would in the future be a self-insurer against war risks. One of the press releases (received by plaintiff July 10, 1942) as well as a telegram from a governmental agency to plaintiff advised that coffee to be imported under these plans "should not be covered by war risk insurance."

In July, August and September plaintiff exchanged with defendant and other governmental agencies a number of other communications relating to the coffee plan. August 27, 1942 it executed and mailed to defendant 1942 C.C.C. Coffee Form, for which it had previously applied. Defendant by letter dated September 7, 1942 returned the form executed by it together with Supplement 1. However, that letter stated that although defendant had executed the Special Coffee Agreement "the ac-

ceptance is subject to the condition that you [plaintiff] accept Supplement No. 1. * * * The Special Coffee Agreement will be completed upon the date that the Commodity Credit Corporation actually receives the two copies of Supplement No. 1 executed by you." September 10 plaintiff executed and mailed Supplement No. 1. The Supplement admittedly arrived at defendant's offices in Washington and though the date is not shown, it is a fair inference that it arrived September 11.

The Special Coffee Agreement (as changed by Supplement 1) so far as here material provides:

"II (A) The Dealer agrees to procure Marine Risk Insurance on all coffee sold to Commodity hereunder under a form of policy approved by Commodity with loss payable clause in favor of Commodity and the Dealer as their interest may appear, but the Dealer shall not procure war risk insurance except as Commodity directs the Dealer to obtain war risk insurance."

"(B) All war risk insurance on any coffee sold to Commodity hereunder which was procured by the Dealer prior to the issuance of directions by Commodity in accordance with II (A) shall be assigned by the Dealer to Commodity and copies of the policies shall be forwarded to Commodity. Commodity shall reimburse the Dealer for any premiums actually paid by the Dealer upon such insurance."

In the case at bar the critical question is whether the last sentence of paragraph II (B) just quoted applies to the $5,735.50 which had been paid September 9, 1942 by plaintiff to Agricultural Insurance Company, on account of premiums which were due under the terms of an open war risk insurance policy, No. 85394 WR, executed October 26, 1938 and of a preliminary open policy declaration, No. 493, made June 25, 1942 and which represented the cost of the protection actually given by the insurance company against war loss during the carriage from Santos, Brazil, to Boston, Massachusetts, in July and August 1942 of 1000 bags of coffee bought from plaintiff by defendant under the terms of the Special Coffee Agreement.

Although the telescoped statement just made is sufficient to show how narrow is the vital issue in this case, before disposing of that issue it may perhaps be desirable to set forth in greater detail the facts compressed in the last paragraph.

September 1, 1937 plaintiff and Agricultural Insurance Company executed an open marine insurance policy No. 85394 insuring whom it may concern against loss of or damage to coffee shipped to plaintiff. Plaintiff was under a duty to report shipments coming within that policy, but, regardless of a report, the risk attached when the coffee left the seller's warehouse. The same parties on Ocober 26, 1938 executed a war risk insurance policy No. 85394 WR also insuring whom it may concern. It covered the same shipments which were insured against marine risks under policy No. 85394; however, the war risk insurance did "not attach * * * prior to being on board an overseas vessel." The war risk insurance policy in referring to the marine insurance policy stated that "the valuations thereof * * * as reported under the said Policy * * * shall be deemed incorporated herein." By a June 10, 1942 rider to the marine insurance policy it was agreed that shipments under that policy should be valued at amount of invoice, plus charges, plus 15% (on account of anticipated profit).

December 8, 1941 plaintiff entered into a contract to buy from a Brazilian exporter coffee including the 1000 bags here material. Having heard that the Brazilian was about to ship those 1000 bags, plaintiff on June 25, 1942 filed with the insurance company's agent a preliminary open policy declaration referring to those bags. That declaration included an excess value of $3,865 on account of anticipated profits. July 10, 1942 plaintiff wrote the agent a letter seeking to cancel that declaration. July 20, 1942 the insurance agent refused to allow cancellation on the apparently untenable ground that the risk had attached. Plaintiff took no further action to cancel. July 21, 1942 the Brazilian exporter delivered the coffee to an ocean vessel, the S. S. Reinholt, for shipment and received in return a bill of lading to the order of plaintiff's bank. The S. S. Reinholt sailed on the next day or two and arrived in Boston in August 1942 with the coffee in good condition.

September 9, 1942 plaintiff paid the insurance company $5,735.50 on account of the application of the war risk insurance policy, No. 85394 WR, to the risk involved in the July and August carriage of the 1000 bags. Thereafter plaintiff delivered to defendant the marine insurance policy No. 85394 but not the war risk insurance

policy No. 85394 WR. May 13, 1943 plaintiff made upon defendant a written demand for $5,735.50. Defendant has never made payment.

■ The detailed facts, as well as the telescoped statement, make it evident that plaintiff is entitled to prevail. It has a promise made by defendant on September 11, 1942 to reimburse it for premiums actually paid on any coffee sold to defendant if the insurance "was procured" by plaintiff prior to the issuance of directions by defendant in accordance with paragraph II(A) of an agreement made September 11, 1942. It is unnecessary for this Court in this case to decide whether as used by the parties the phrase "was procured" means "was executed", "was effectuated", "was effective in the sense that the risk had attached", "was covered by a general open policy", or "was the subject of a special declaration." For, whatever else that phrase means, the phrase and the promise certainly include an obligation on defendant's part to pay such war risk insurance premiums attributable to the coffee purchased as had been contracted for, earned and paid prior to the giving of the promise on September 11, 1942. Since the premiums here involved were contracted for, earned and paid prior to September 11, 1942, they are recoverable.

Most of the points raised by defendant in opposition to this conclusion may be disposed of summarily.

■ Defendant seeks to interpret the agreement of September 11, 1942 in the light of the preliminary negotiations, press releases and the like. The agreement itself is complete and unambiguous. And it is elementary that under such circumstances resort to extrinsic evidence is not permissible. Seitz v. Brewers' Refrigerating Co., 141 U.S. 510, 517, 12 S.Ct. 46, 35 L. Ed. 837. Am.L.Inst.Restatement, Contracts, § 237.

Next, defendant attempts to construe the agreement as though it were made or became effective as of some date in July 1942. But the agreement was made September 11, 1942 when the documents reached defendant's office and (as specified in substitute paragraph IX added by Supplement No. 1 to the Special Coffee Agreement) the agreement became "effective upon" that date.

■ Then, defendant contends that plaintiff was in a fiduciary relationship to defendant and that, therefore, plaintiff had, first, a duty to cancel its war risk insurance policy with the private insurance company and, second, if the policy had not been canceled, a duty before executing the contract of September 11, 1942 to make disclosure of the payment made on September 9 to that private insurance company.

This contention starts from untenable premises. Whatever may have been the earlier arrangements between the parties, in the September 11, 1942 agreement plaintiff acted solely as a seller, not a fiduciary. It was making a contract to sell coffee and the buyer was agreeing to assume certain costs including some insurance items.

That contract of sale imposed on plaintiff no express and no implied duty to cancel outstanding insurance, much less a duty to have canceled insurance fully earned weeks before the contract was executed. Moreover, obviously it would have been an imprudent course for plaintiff to have canceled in July its private war risk insurance in the mere anticipation that it would execute in September an agreement under which defendant would buy and assume the insurance costs of 1000 bags of coffee. While plaintiff on July 10, 1942 apparently started on such an imprudent course when it tried to cancel and indeed may have momentarily effectively canceled its private policy, it was fortunate for plaintiff that the insurance agent on July 20 refused to allow the cancellation to stand and that plaintiff was content to let the company maintain the insurance coverage. Otherwise if the S. S. Reinholt had been torpedoed in August 1942 before defendant had signed a firm contract, plaintiff would probably have been in a sorry plight. At best it would have had an even merrier chase for its money than it has been given by the watchdogs of defendant's treasury in the present case.

Moreover, defendant's notion that there was something reprehensible in plaintiff not having disclosed to defendant prior to September 11, 1942 plaintiff's payment made on September 9 to the private insurance company is based on defendant's misconstruction of the Special Coffee Agreement of September 11, 1942 and defendant's specific undertakings therein. Defendant agreed, and plaintiff was justified in believing defendant deliberately meant to agree, to assume the cost at least of all insurance premiums paid for war risk insurance which had been earned prior to

September 11, 1942 when the parties made an agreement passing title to coffee from plaintiff to defendant.

■ Defendant also contends that the entire premium paid by plaintiff should not be recovered because part of it represents payment for covering excess value of the coffee attributable to anticipated profit. The answer to that contention is that defendant's promise is to reimburse plaintiff for its premiums, even if they were based on a high valuation, so long at least as the valuation was in accordance with normal insurance standards and not plainly fictitious.

■ Defendant finally asserts that plaintiff has not met the condition necessary for reimbursement of its premium payment because it has not assigned to defendant the policy on which the premium was paid. For at least three reasons that is an unsound contention. The assignment of the policy was not made an express condition of the reimbursement. Moreover, the equivalent of assignment of policy No. 85394 WR to defendant did in fact occur by the policy's own terms without any shuffling of documents when the interest in the insured coffee was transferred to defendant, that is, the policy ran to the benefit of whom it may concern. And, finally, what is more important, assignment in any formal sense would have been a useless formality since the coffee had been transported, the premium earned and the risk avoided when the S. S. Reinholt arrived in Boston a month before the reimbursement contract was executed. After the ship's safe arrival the policy No. 85394 WR, so far as concerns the 1000 bags of coffee here involved, was about as valuable as last year's motor vehicle liability insurance policy is to a car owner.

■■ The one remaining point to consider is the rate at which interest runs from the date plaintiff made demand for payment until the date of judgment. This is a question of contract law and since the contract was made with an agency of the United States, it is governed by rules promulgated by the United States statutes or, in their absence, by judges of the United States Courts. S.R.A., Inc., v. State of Minnesota, 66 S.Ct. 749; United States v. Conti, D.C.Mass. Jan. 24, 1946, 64 F.Supp. 187. Under the rule approved in Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 297, 61 S.Ct. 995, 85 L.Ed. 1361,

and United States v. Conti, supra, a suitable rate of interest would be the rate prevailing where the contract was made, the District of Columbia. That rate is 6%, Code of the District of Columbia, Ti. 17, ch. 1, § 1. That is the same as the rate in Massachusetts, Mass.G.L.(Ter.Ed.) c. 107, § 3. United States v. Conti, supra.

Judgment for plaintiff for $5,735.50 together with interest at 6% from May 13, 1943.