ASHEVILLE MICA COMPANY, Eugene
Munsell & Co. and Schwab Brothers
Corporation, Plaintiffs,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

MANCHARD TRADING CORPORA-
TION, Plaintiffs,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

UNITED MINERAL & CHEMICAL
CORP. and Sigbert Loeb,
Plaintiffs,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

United States District Court
S. D. New York.

March 4, 1965.

Alfred P. Walker, New York City, for plaintiffs Asheville Mica Co., Eugene Munsell & Co. and Manchard Trading Corporation.

George Trosk, New York City, for plaintiff Schwab Brothers Corp.

Joseph Eisinger, New York City, for plaintiffs United Mineral & Chemical Corp. and Sigbert Loeb.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City, for Commodity Credit Corp. (Eugene R. Anderson and Arthur M. Handler, Asst. U. S. Attys., of counsel).

RYAN, Chief Judge.

These suits were filed for a declaratory judgment (Federal Declaratory Judgment Act, Title 28 U.S.C.A. §§ 2201, 2202) and for damages and interest for alleged breach of contract. They involve interpretation of the price revision clause in Commodities Exchange contracts entered into severally between defendant and plaintiffs.

Plaintiffs seek as damages the difference between the prices allowed, as exchange values by defendant to the respective plaintiffs and the prices which should have been allowed, as exchange values, pursuant to the price revision clause, as it allegedly should have been interpreted. Defendant asserts counterclaims against two plaintiffs, Asheville and Schwab, for damages arising from their failure to deliver specified mica at an average exchange value of $4.00 per pound.

The suits come to us following remand by the Court of Appeals and after prior trial by one of our learned senior brothers. The three consolidated suits were presented, briefed and argued together.

The six plaintiffs are among the largest importers of mica into this country. For many years, before 1956, all held contracts with the General Services Administration (GSA) for the sale of mica. During the summer of 1956 plaintiffs entered into contracts with the defendant, Commodity Credit Corporation (CCC) for delivery over a two year period ending June 30, 1958 (the time of delivery was later extended to December 30, 1958) of block and film mica and mica splittings of Indian origin in exchange for surplus agricultural commodities. Except for variations in the quantity of mica to be delivered, and the value of the agricultural commodities to be received, the contracts were identical in all material respects.

The principal controversy between the parties concerns the "exchange value" term of the contracts. The prices for the various grades and qualities of material were specified in section 2.m. of the bar-

ter contracts, and CCC has paid the contractors in accordance with that schedule. Plaintiffs claim, however, that they are entitled to higher prices in accordance with section 2.b.(1) of the barter contracts.[1]

On December 2, 1957, one of the plaintiffs, Sigbert Loeb, entered into a new purchase contract with GSA. This contract reflected higher prices for most of the items than were specified in the contracts with the CCC. On January 16, 1958, another plaintiff, United Mineral & Chemical Corporation, also entered into a new purchase contract with GSA, which included these higher prices. Finally, during May 1958, three of the other four plaintiffs (all except Manchard Trading Corporation) entered into new purchase contracts with the GSA, which contained basically the same price terms as the Loeb and United contracts.

Plaintiffs contend that pursuant to section 2.b.(1) they are entitled to the same increases in their contracts with CCC as were granted by GSA. Loeb and United allege that they should receive their increase as of the date of their new contracts with GSA. The four other plaintiffs contend that their increase is effective as of the date of Loeb's new contract with GSA.

The Court of Appeals held that Loeb and United were entitled to an increase in prices from the CCC as of the respective dates of their new contracts with GSA. It stated that it was the intent of the parties to include new GSA purchase contracts within the scope of section 2.b.(1) in order to determine the functioning of the escalator clause. Therefore, it follows that the three other plaintiffs, who made new GSA contracts in May 1958, are entitled to receive price increases from CCC at least from the date of their new contracts. The Court of Appeals left to our determination, however, the issue whether the increase due these plaintiffs should be measured from December 2, 1957, the date of Loeb's new contract with GSA. (If we find that December 2, 1957, should be used as a measuring date, Manchard would also be entitled to an increase.)

There are also three other issues which have been left for our determination on this remand.[2] The first of these other issues is whether in determining the exchange value for each plaintiff pursuant to clause 2.b.(1), such determination should be made only in relation to types, colors, grades, and qualities of mica of Indian origin for which that plaintiff had prices established under its GSA purchase contracts in effect at the time of execution of the Mica Barter contracts.

The second of these remaining issues is—If the Court decides that plaintiffs

---

1. This sections reads:
 "b. *Exchange Value.*
 "(1) The exchange value per pound of mica delivered at Harborside Warehouse,—shall be based on the prices per pound for kinds, color, grades and qualities as shown in Section 2.m., 'Schedule of Mica Prices': *Provided,* That in the event the General Services Administration, hereinafter referred to as 'GSA' and the contractor should by agreement increase or decrease the unit prices under GSA's purchase contracts with the contractor for block and film mica of Indian origin, (currently those shown in Section 2.m. hereof), such adjusted prices shall be used in determining the exchange value of block and film mica accepted, under the contract when such adjusted prices are in effect. For the purpose of this provision, the date of acceptance shall be the date of GSA Inspection Report to the contractor, showing the net weight, quality and grade of mica accepted * * *."

2. At the time of the remand, we also had before us the issue whether the date, when the above prices and kinds of mica were included in the GSA contracts, should be calculated from the time when plaintiffs or from when CCC executed the particular contract. All interested parties now agree that since all contracts were signed last by plaintiffs, this is the time when the contracts came into effect and it is from these dates that the inclusion of prices and kinds of mica should be calculated.

Schwab, Munsell and United are entitled to price adjustments from the date of their respective new GSA contracts, should these adjustments give effect to the special price provisions which were included in their new GSA contracts?

The third and last of these issues is— Are the plaintiffs entitled to interest on any recovery?

Plaintiffs Asheville and Schwab argue that the amount recoverable by defendant on its counterclaim has not been fixed by the Court of Appeals. We hold that the Court of Appeals fixed the amounts which might be recovered on the counterclaims as $2,451.34 against Asheville and $18,254.14 against Schwab, but withheld entry of judgment awaiting final determination of their claims against defendant.

I. *Should the exchange values of block and film mica of Indian origin accepted from each plaintiff on and after December 2, 1957, the date of Loeb's new GSA purchase contract, have been determined on the basis of the prices set forth in Loeb's new GSA purchase contract?*

■ We find that plaintiffs are entitled to an increase from December 2, 1957, the date of Loeb's new GSA contract. The depositions of the men who negotiated the barter contracts show that the parties intended to insure price uniformity between GSA and CCC for all sales of block and film mica of Indian origin to the two agencies.

The Court of Appeals, in its opinion (supra) considered the testimony of the contracting parties and concluded:

"Mr. McClain, Mr. Crim of the GSA, and the various officials of the plaintiffs all testified without contradiction that the purpose of the 'escalator' clause was to assure price parity among the various contractors, in view of the facts that the mica market was extremely sensitive, and that even a slight difference in price might result in the loss of supplies to contractors who could not meet it." 2 Cir., 335 F.2d 768, 771.

"It seems clear that the purpose of the 'escalator' clause was to preserve price parity between the mica acquired by GSA and that by CCC." 335 F.2d 768, 771.

"The CCC's evidence falls far short of demonstrating that price uniformity between the GSA and CCC contracts was not an expectation of the parties * * *." 335 F.2d 768, 772.

These statements of the Court of Appeals, however, were only meant to substantiate its holding that the "escalator clause" in the CCC contracts encompassed new GSA contracts as well as existing GSA contracts. The Court of Appeals left for further trial the issue whether, by virtue of the "escalator clause", each barter contractor is entitled to receive from CCC any price change for Indian mica provided to be paid in any contract made between GSA and any contractor. It wrote:

"What we have said thus far indicates that we believe that plaintiffs Loeb and United proved their case to the extent that judgment against them was erroneous. The contentions of the other appellants, however, raise rather a different question. The language of clause 2.b.(1) in all the contracts refers to agreements between GSA and the 'contractor,' and the term 'contractor' is specifically defined as the particular contracting party. It is evident that to adopt the construction argued for by Asheville, Schwab, Munsell and Manchard, and hold that their right to higher prices accrued not from the date of their own new contracts but from the date of Loeb's, requires considerably more by way of interpretation than to adopt Loeb's and United's version of the agreement. Because of the District Court's view of section 2.b.(1) it did not reach this issue * * *. We believe that, since the case must be remanded for determination of these points, it would be best to have its view on this question of fact, sub-

ject to our later review limited to whether the finding as to what was intended was 'clearly erroneous.'" 335 F.2d 768, 772.

The portion of section 2.b.(1) referred to by the Court of Appeals reads:

" * * * That in the event the General Services Administration, * * * and the contractor should by agreement increase or decrease the unit prices * * *."

A typical use of the term *"the contractor"* in the drafting of the barter contracts is found in the following:

"This contract entered into by and between Commodity Credit Corporation * * * hereinafter called 'CCC', and ASHEVILLE MICA COMPANY, * * * hereinafter called 'the contractor'."

It is necessary to weigh the testimony of the contracting parties to determine what the parties intended by this language. The Court of Appeals considered this testimony, because it decided that clause 2.b.(1) is "not wholly unambiguous". It dealt, however, with the question whether 2.b.(1) concerned itself only with "existing" contracts between plaintiffs and GSA. We find that similarly in determining who can activate the "escalator clause", 2.b.(1) is "not wholly unambiguous".

The Court of Appeals repeatedly stated that the purpose of the "escalator clause" was to insure "price parity", "price uniformity" "among the various contractors", "between the mica acquired by GSA and that by CCC". This language may be read to indicate an intent to maintain equivalent prices between GSA and CCC for all contractors. The extrinsic evidence that the Court of Appeals considered is equally relevant to a determination of the question before us. We find that the person who might activate the "escalator clause" is not "determined" by the language of 2.b.(1) and we must refer to evidence extrinsic to the contract. (See Court of Appeals opinion, 335 F.2d 768, 770 and cases cited therein.)

The history of the CCC barter contracts reveals the following: In 1952, GSA entered into a series of "D" program contracts to purchase mica for strategic stockpiling purposes. The contracts were to continue until June 30, 1957, but some were later extended until December 31, 1957. GSA adopted a policy of price uniformity amongst all "D" contract contractors. There was a clause in each "D" contract, which provided that if any "D" contractor obtained a price change, the change would immediately become effective for all "D" contractors. The evidence shows that the reason for this policy was that the mica market in mica-producing countries was very sensitive. GSA found that if a price increase were granted to only one contractor, the contractors receiving lower prices would tend to hold up deliveries with the hope of obtaining higher prices. At the same time, foreign mica producers might slow down their deliveries after they had learned of a price increase unless it was extended to them.

From 1952 until Loeb's 1957 contract increases, there was no change in the price paid for Indian mica. Initially, GSA paid the same price for mica from India as from Brazil, the two principal sources of mica. In 1954, however, due to inflation in Brazil, prices for mica of Brazilian origin were increased by nearly twenty percent. Thereafter, uniformity of prices was maintained only for mica originating in a particular country. When the increase for Brazilian mica became known, however, pressure was brought upon GSA by importers, the State Department, and American consulates in India, to provide for a corresponding price increase for Indian mica. GSA resisted the pressure, however, until its original "D" contracts expired. GSA executed its first contract under an extended five year "D" program on December 2, 1957.

CCC began in 1955 to explore the possibilities of buying mica in exchange for surplus agricultural commodities.

The office of Defense Mobilization and GSA determined the quantity of mica for which CCC could barter. CCC consulted with GSA to decide with which contractors it was advisable to deal and how much mica each of them could be expected to deliver. When CCC received mica from these contractors, it turned it over to GSA by whom it was later reimbursed. Therefore, GSA was deeply interested in the mica purchases of CCC. Mr. Crim of GSA's purchasing division informed Clifford McClain, the chief negotiator for CCC as to the source of the mica, the method of acquisition and other similar details. GSA also advised CCC that it had to provide in the barter contracts for uniformity of prices otherwise, one of the two agencies would not be able to obtain the material. The testimony of McClain and of Crim shows that the CCC intended to create price uniformity between CCC and GSA for the same mica items.[3]

3. Mr. McClain testified:

"This letter was in reply, as you will note, to our letter from the barter and stock piling division, which I wrote, dated September 12. That referred to the first conference with Mr. Sykes of Munsell Barter Company, in which he had raised the point * * *.

"Mr. Sykes stated that if they were to enter into any such contract, or as a condition to entering into any such contract, provision would have to be made for the adjustment of any prices to agree with price changes for strategic block and film mica made by the General Services Administration during the term of the barter contract. Otherwise, he pointed out, that one of the other agencies, either the Barter and Stock Piling Division, or the General Services Administration, could not hope to obtain delivery of the Indian mica, the material from both agencies coming from the same source in India.

"When the question was first raised, it seemed different from any basis that we had used in other barter contracts for other material, so I raised the question with General Services Administration pointing out that I didn't know, or I didn't feel that we could barter on a basis where the price for the mica would be subject to change.

"This letter, which came back, was somewhat inconsistent, as you will note. First, by agreeing with the position that I had stated and in another paragraph pointing out that it would be necessary in bartering for mica to provide for uniformity in prices, otherwise one of the other two agencies would not be able to obtain the material and that if we were permitted to enter into any barter contracts, that would be necessary * * * a necessary part of the contract.

"So with that clarification of the requirements as they related to bartering for mica, we determined that that arrangement would have to be made and from that point on in all of the discussions, in all of my discussions with the mica suppliers, that condition was met and we agreed that in any of our contracts we would provide for adjustment if GSA changed the prices under their purchase contracts." pp. 10–12 McClain Deposition

"Q. Were they ever advised by you as to your discussions with Mr. Crim of GSA and the memoranda which you received from GSA relating to a fixing of the prices in these proposed mica barter contracts?

"A. They were advised of the requirements for maintaining uniform prices throughout the term of the contract." pp. 32–33 McClain Deposition

"Q. I believe you stated that there came a time in 1955, as a result of your negotiations or discussions with Mr. Crim and others in GSA, that any barter contracts entered into would have to provide for a price adjustment to conform with the prices to be paid by General Services Administration; is that correct?

"A. That is right, and that was a condition made by the contractors in their discussion of their offers, proposals." pp. 50–51 McClain Deposition

"Q. Calling your attention, Mr. McClain, to Exhibit 1, a memorandum of September 16, 1955, yesterday I believe you pointed out what you regarded as a discrepancy between two paragraphs in that exhibit; is that right?

"A. That is right. * * *

"A. * * * The discrepancy I referred to here is on the first page under the paragraph numbered one, which I will read:

"'We believe it would best serve the interests of the government and the trade in general if prices were maintained at a consistent level for all contractors. Past experience has proved that disparity in prices for the same item usually results in the failure of the low prices contractor to deliver or delivering inferior mica.'

Both McClain and Crim desired and intended to create price uniformity between CCC and GSA for the same Indian mica items. Defendant has not shown that other officers of CCC or GSA had a different intent than these two. Officers of the plaintiff corporations also testified that it was intended that the barter contracts create uniform prices between CCC and GSA. None of the contracting parties testified that it was intended that a contractor would receive increased prices from CCC only when GSA increased prices for the particular contractor. In light of the GSA's mica buying policy and the reasons for this policy, there does not appear to be any reason for it to have adopted a purchase plan whereby an individual contractor would receive the same price from GSA and CCC, but there would be a difference in price between various contractors. If defendant's interpretation were accepted, plaintiffs would have received different prices during the period between December 1957 and May 1958 when all except Manchard entered into new GSA contracts. This would have been disruptive of "price parity" and the "policy of price uniformity" which we have seen was the purpose of the "escalator clause".

The pattern of contracts and pricing between GSA and CCC indicates uniform price conception. Prior to 1956, GSA paid uniform prices to all contractors. The provisions of the CCC contracts and their identical language indicate a common attitude on the part of CCC towards the contractors. All CCC contracts were entered into during a two month period. CCC executed six of the seven contracts on the same day, June 28, 1956, and all contracts contain identical pricing schedules. The prices in the CCC contracts were the same as those being currently paid by GSA, and until December 2, 1957, the same prices were paid by both of these agencies for contractual purchases of Indian mica. All new contracts executed by the GSA contain the new standard price for Indian mica, which had been extended to Loeb on December 2, 1957.

It was not by mere chance that GSA undertook to pay plaintiffs identical prices in all new contracts. GSA dealt with all contractors as members of a single group. Similarly, CCC intended to treat all mica importers, with whom it dealt, as a group. As the Court of Appeals observed:

"* * * it would surely defy reason to hold that different consequences should flow from a formal decision by GSA, not a party to this contract, to enter into new contracts

"Now, on the last page, when the question was first presented of the need for adjustment of prices of mica in the event GSA changed the prices under its purchase contract, that was different than was usually the case in other contracts. So I, in transmitting a letter to GSA, raised a question as to whether we could make that type of contract.

"So, on the last page of this letter, they agree with my suggestion that that may not be possible to do, which is in conflict with the paragraph I read on page 1, so that our later discussions, of course, it was understood that this requirement made by the contractors would have to be met and that that would be in conformity with GSA's requirements, since they were purchasing mica from the same people, and would meet the requirements of the conditions stated by the barter contractors." pp. 58–60 McClain Deposition.

Mr. Crim testified:
"Q. With respect to price adjustment policies, what did you state to Mr. McClain?
"A. I recommended verbally and in writing that in order to obtain strategic mica, that there should be uniformity of prices comparable to those currently included in GSA contracts. Otherwise they wouldn't get the mica, period." p. 6 Crim Deposition
"Q. By that date, October 21, 1955, was Mr. McClain in agreement also with the idea that any barter contracts entered into by CCC should contain a price schedule uniform with that of GSA contracts and providing also that provision should be made in such barter contracts to increase the prices?
"A. To adjust the prices.
"Q. To adjust the prices in accordance with the prices of GSA contracts?
"A. That is correct." p. 44 Crim Deposition

with its suppliers rather than extend the life of the old ones." 335 F.2d 768, 771.

Likewise, it would not have served the common purpose of these two agencies to have provided that the amount a party to a CCC contract would receive depended on the date which GSA found convenient to execute a new contract with that party.

II. *In determining the exchange value for each plaintiff pursuant to clause 2.b.(1), should such determination be made only in relation to types, colors, grades and qualities of mica of Indian origin for which that plaintiff had prices established under its GSA purchase contracts in effect at the time of execution of the Mica Barter Contracts?*

■ Each plaintiff is entitled to an increase in prices for all types, colors, grades and qualities of Indian mica whether or not they were included in its original contract with GSA. The intent of the parties in executing 2.b.(1) we have found was to effectuate a policy of price uniformity between CCC and GSA. Each of the pricing schedules in the barter contracts contained ninety-five mica items, but the number of items enumerated in the old GSA contracts varied from forty-eight for Asheville and Munsell to five for United. Therefore, if defendant's contention were adopted, two contractors, selling the same mica item to GSA and to CCC, would receive different prices from the two agencies, if only one contractor's old GSA contract had included the item. Asheville and Munsell would be entitled to increases on forty-eight items, Manchard on forty-one, Schwab on thirty-six, Loeb on twenty-one, and United on five. This certainly would not effectuate a policy of price uniformity.

Secondly, the Court of Appeals held that 2.b.(1) included price changes in new GSA contracts as well as existing GSA contracts. There is no suggestion in the language of the Court of Appeals that these price changes are limited to items contained in the pre and post 1957 GSA contracts. Indeed, it follows that if 2.b.(1) is not limited to existing GSA contracts, it should not be limited to items included in those contracts.

There is no suggestion in the deposition of McClain or in the testimony of any of the other contracting parties that 2.b.(1) is so limited. Defendant alleges that a telegram, sent April 4, 1956 by CCC to Asheville, was interpreted by McClain to limit price changes to items included in the original GSA pricing schedules. Judge Leibell, our very learned and experienced senior judge, in his opinion rendered after the prior trial, found that "the telegram formed the basis for the language used in section 2.b.(1) * * *". The telegram read:

"* * * The exchange value block and film mica accepted will be based on the unit prices this material Indian origin currently in effect under purchase contracts you have with General Services Administration, subject to any increase or any decrease in said prices effective as of the date any such contract price changes are agreed to in writing by GSA."

McClain testified that the telegram's reference to the existing contract was for the purpose of identifying the pricing schedules in the existing GSA contracts. The telegram and McClain's testimony do not limit price changes to types of mica in the existing pricing schedules. It is clear that the language as interpreted refers to prices in the existing GSA pricing schedule and not to mica items.

Thirdly, there is no indication in the language of 2.b.(1) that the clause is limited to kinds and qualities of mica common to both existing and subsequent GSA contracts. The clause states:

"* * * That in the event the General Services Administration * * * and the contractor should

by agreement increase or decrease the unit prices under GSA's purchase contracts with the contractor for block and film mica of Indian origin, (currently those shown in Section 2.m. hereof), such adjusted prices shall be used in determining the exchange value of block and film mica accepted under this contract when such adjusted prices are in effect. * * *."

The only mention in the above language of mica types is "block and film mica of Indian origin" and "block and film mica". There is no mention in this language of colors, or qualities of mica. All of the disputed deliveries to the CCC involved block and film mica. Defendant does not contend that 2.b.(1) includes other than this form of mica. (Block and film mica must be distinguished from colors and qualities such as ruby and muscovite.) Defendant does contend, however, that since 2.b.(1) provides for an "increase" or "decrease" in prices and for "adjusted prices" these terms would be meaningless unless there had been a price for the particular item in the original GSA contract. It is clear, however, that 2.b.(1) alludes to "increases", "decreases" and "adjusted prices" in relation to the prices and items set forth in section 2.m. rather than to those in the individual GSA contracts. All of the disputed deliveries have involved items contained in Section 2.m. This section is composed of pages of price schedules for varying types and qualities of mica. There is no relation between the types of mica for which the individual supplier had contracted to supply GSA and the mica in 2.m. In fact, most of the items in 2.m. were not in the original GSA contracts.

The CCC–GSA policy of price uniformity; the opinion of the Court of Appeals and the testimony of the contracting parties; and the language of 2.b.(1) all lead us to our conclusion that the escalator clause is not limited to items included in a party's original GSA contract.

III. *If The Court decides that plaintiffs Schwab, Munsell, and United are entitled to price adjustments from the date of their respective new GSA contracts, should these adjustments give effect to the special price provisions which were included in their new GSA contracts?*

We have found that plaintiffs are entitled to price adjustments from the date of Loeb's new GSA contract, but nevertheless, we feel that the effect of the special price provisions call for some further discussion. Defendant urges that because of these price provisions, Schwab, Munsell and United's new GSA contracts were intended to maintain the old GSA prices for these plaintiffs. If this were so, we would be compelled to conclude that GSA had rejected its policy of price uniformity. There would be two different "unit prices under GSA's purchase contracts", and consequently, we would have to decide whether it would be necessary to calculate the price changes allowed under 2.b.(1) of the barter contracts on a different basis than we have done. We find, however, that in Schwab, Munsell and United's new GSA contracts it was intended to grant to these plaintiffs the same increase in mica prices granted to other plaintiffs.

Schwab and Munsell's new GSA contracts contain the following provision:

" * * * that with respect to the first 10,000 pounds of strategic block mica delivered and accepted hereunder, the value of each lot constituting the first 10,000 pounds shall be computed by applying, on a 50-50 ratio, the unit prices set forth in Contract No. GS–OOP–(D)–18010, as amended * * * (now terminated), and the unit prices set forth in the schedule below. * *"

United's new GSA contract provided:

"It is agreed that the quantities of mica, which the United Minerals & Chemical Corporation is obligated to or has the option to deliver under Contract No. GS–OOP–(D)–18040

and which have not been delivered under that contract, will be delivered under and subject to the terms of this contract except that the prices paid shall be at the unit prices stated in said Contract No. GS–OOP–(D)–18040. Such quantities of mica shall be delivered by January 31, 1958 and shall be in addition to the quantities due under this contract."

Defendant argues that these provisions are an express negation of any price increase. If defendant were to prevail on this, the three plaintiffs herein concerned, unlike other plaintiffs, would not be entitled to an increase in prices under their CCC contracts. Defendant's argument is fallacious. The Court of Appeals stated:

" * * * Again, the various special price provisions in the new GSA contracts with certain of the plaintiffs simply meant that, because they were in default in deliveries under the old contracts, the initial quantities of mica delivered under the new contracts would be at the old, lower price. The CCC's evidence falls far short of demonstrating that price uniformity between the GSA and CCC contracts was not an expectation of the parties * * *."

We find too that GSA did not reject its policy of price uniformity in the phrasing of these provisions. GSA instituted the same price changes for all mica suppliers. All new GSA contracts contained the identical new price schedule. We find from the language of the special price provisions that GSA intended only that Schwab, Munsell and United had to fulfill part of their former contracts under the old terms. The provisions distinguish between the quantities of mica to be delivered under the old prices and those for which the new contractual prices prevail.

We conclude, that by making new contracts with Schwab, Munsell and United, GSA formally extended to these parties the new price schedule for Indian mica, which it had granted to Loeb on December 2, 1957. As of this date, the trade understood that they could expect to receive the new prices in any new contract which they might make with GSA. Apparently, some of the plaintiffs, who had not completed deliveries under their old contracts, held them up with the hope that they would collect the higher prices. The fact that GSA asserted its right to receive this mica (probably already in the possession of the suppliers) for the old prices does not change the fact that its new price scale became effective on the mica market on December 2, 1957. As we have heretofore concluded, it is this date which should govern the allowance of increased prices by CCC.

IV. *Are plaintiffs entitled to interest?*

 Sovereign immunity bars the recovery of interest against the United States unless Congress has waived this immunity by statute or contract. (United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 [1947]; United States v. New York Rayon Co., 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577 [1947]; United States v. Alcea Band of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 [1951]; United States v. Goltra, 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776 [1941]; Farrand Optical Co. v. United States, 325 F.2d 328 [2d Cir. 1963]).

CCC is a government corporation under the supervision of the Department of Agriculture. Congress had the power to endow this wholly owned government corporation with any of the immunities enjoyed by the United States, and could have granted to it immunity from payment of interest.

The doctrine of governmental immunity from suit is not presently judicially extended to a government corporation authorized to engage in commercial transactions with the public, unless it clearly appears from the language of a statute or the legislative history and other relevant circumstances that Congress intended to grant immunity from a particular liability. Keiffer & Keifer v. Reconstruction Finance Corporation,

306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; F. H. A. Region No. 4 v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724; R. F. C. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; United States v. Edgerton & Sons, Inc., 2 Cir., 178 F.2d 763.

Congress did not specifically grant CCC immunity from payment of interest. The legislative history of the Commodity Corporation Charter Act shows that Congress did not intend to grant immunity in this instance, and that the purpose behind the Commodity Credit Corporation Charter Act was not to grant immunity. We conclude that plaintiffs are entitled to interest.

Title 15 U.S.C. § 714b, which delineates the general powers of CCC provides that:

"The Corporation— * * *

"(c) May sue and be sued, but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Corporation or its property.

* * * * *

"(e) Shall have all the rights, privileges, and immunities of the United States with respect to the right to priority of payment with respect to debts due from insolvent, deceased, or bankrupt debtors. The Corporation may assert such rights, privileges, and immunities in any suit, action, or proceeding."

Other than these provisions the statute does not extend any immunities to CCC.

Plaintiffs cite Stanley W. Ferguson, Inc. v. Commodity Credit Corporation, D.C., 65 F.Supp. 261, aff'd. 161 F.2d 540 (1st Cir. 1947), which allowed interest to be assessed against CCC. Defendant argues that this decision is no longer to be applied because it involved transactions with CCC as it existed prior to 1948 when it was a Delaware corporation. The Commodity Credit Corporation Charter Act, effective June 30, 1948, reestablished the agency as a fed-

eral corporation. The Legislative History of the Act shows that the Senate Subcommittee on Agriculture and Forestry and the Secretary of Agriculture supported a Bill which would have made CCC immune from the payment of interest, but that this proposal was rejected by the House of Representatives and was not included in the Bill as finally passed. The Senate Subcommittee in its Report stated that Subsection (e) (of the proposed Bill)[4]

"provides that the Corporation shall have the rights, privileges, and immunities of the United States and may assert them in any suit, action, or proceedings. Since the Corporation is an agency of the United States which, in the final instance, will bear any losses suffered by the Corporation, it is desirable that the Corporation be clothed with the rights, privileges, and immunities of the sovereign. The section enumerates, but not by way of limitation, certain of the rights, priorities, and immunities of the United States which would, by virtue of this section, be enjoyed by the Corporation. The enumerated limitations are, generally speaking, those which, by decision of the Supreme Court, are not presently enjoyed by the Corporation; for example, * * * *exemption from allowance of interest on claims and judgments; * * *.*" 1948 U.S.Code Cong.Service, p. 2149

The rejection of this proposal and the limitation of immunity to that set forth in 15 U.S.C. § 714b(c) and (e) show that Congress did not intend to change from the judicial construction of the existing law which required CCC to pay interest. The 1948 Commodity Credit Corporation Charter Act was passed because the Government Corporation Control Act (effective December 6, 1945—31 U.S.C. § 841 et seq.) provided that:

"No wholly owned Government corporation created by or under the laws of any State * * * of the

---

4. This corresponds to section 714b(e) of the Act as finally passed, which is quoted above.

United States * * * shall continue after June 30, 1948, as an agency or instrumentality of the United States. * * * Provided, That prior thereto any such corporation may be reincorporated by Act of Congress * * * with such powers, privileges, and duties as authorized by such Act, * * *." § 869(b)

Section 841 of the Government Corporation Control Act declares that—

"It is declared to be the policy of the Congress to bring Government corporations and their transactions and operations under annual scrutiny by the Congress and provide current financial control thereof."

CCC was reincorporated federally so that Congress would have control over its financial affairs. The legislative background of the reincorporation of CCC as a federal corporation reveals no Congressional intent to endow CCC with immunity from the payment of interest.

## V. *Damages*

■ We have found in the affirmative as to issues Nos. 6(1) and 6(7) and in the negative as to all of the other issues which we held were still open upon the remand. Issue 2 was whether the increase in prices should be effective from the date of each contractor's new contract with GSA. We said that they were entitled to increases as of the date of Loeb's new GSA contract. Issue 3, we have held was no longer open. Issues 4 and 5 were whether price changes should be limited to those grades and qualities of mica present both in a contractor's old and new GSA contracts. We have held that increases were not so limited. Issue 6, presented the question, whether certain provisions in three of the contractors' contracts should be considered in calculating the damages if issue 2 were answered yes. We have held that we did not have to answer this because we have answered No to question 2, but that in any case these provisions did not change the policy of GSA

which was to maintain one price for all purchases of Indian mica. Issue 7 dealt with interest and we answered Yes. As to issue 8, we held that the Court of Appeals had answered it.

Therefore, the damages as stipulated in the pretrial order paragraph 7 (see page 71a) are: (1) if the Court should find in the affirmative as to issue 1 and in the negative as to issues (4) and (5):

| | |
|---|---|
| Asheville | $ 9,897.40 |
| Munsell | 60,594.03 |
| Schwab | 38,233.71 |
| Manchard | 13,952.37 |
| United | 7,449.79 |
| Loeb | 17,732.21 |

We have noted that the Court of Appeals has held that CCC on its counterclaims should recover $2,451.34 against Asheville and $18,254.14 against Schwab. Asheville shall recover $7,446.06 and Schwab shall recover $19,979.57. The remaining plaintiffs shall recover in the amounts above stipulated.

The parties have also stipulated that interest, if allowed, shall be computed from the following dates up to the date of entry of judgment: United from September 30, 1959; Loeb from June 30, 1959; Asheville, Munsell, Manchard and Schwab from December 31, 1958. The law appears to be that the applicable rate of interest is the rate prevailing where the contract is made. Stanley W. Ferguson, Inc. v. CCC, 65 F.Supp. 261, page 265 and see Supreme Court cases cited therein. There is a problem in that the plaintiffs, excepting Asheville only, signed their contracts after CCC had signed and therefore, the contracts were made in several different jurisdictions. In the stipulation the parties do not provide for what rate of interest we should apply. We find that interest at a rate of 6% for all plaintiffs should be allowed as provided for by local New York law. It appears that the contracts of Schwab, United and Loeb were made in New York and there is no claim that the law applied in Washington, D. C.,

where the Asheville contract was made, or in New Jersey where the Munsell contract was made, differs from the law of New York.

Let the parties compute the amount of interest at 6% and submit a proposed judgment in accordance with the foregoing on five days notice of settlement.

